WILKINS SEACORD

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa September 26, 1887.*

1.  NUISANCE—*indictment therefor—its requisites.*  Generally, an indictment for a nuisance which charges the offence substantially in the language of the statute, will be sufficient.

2.  An indictment for such offence will be sufficient if the acts constituting the alleged nuisance be set out with the detail and fullness required in respect of other offences,—that is, that the facts set out shall identify the transaction and affirmatively show *prima facie* guilt.    When a thing is not a nuisance of itself, but becomes so by special circumstances, these must be alleged.

3.  An indictment charging that the defendant, on, etc., at, etc., unlawfully and willfully did cause and suffer the carcasses of divers dead animals, and a large quantity of offal, filth and noisome substances, then and during all the time aforesaid, and there to be collected, deposited and to remain near the dwelling houses of A, B, C, and others, there situate, and being then and during all the time aforesaid, and there to the prejudice of the said A, B, C, and others, and to the common nuisance of all the people there lawfully

being and abiding, sufficiently describes the offence of nuisance under the first clause of section 221 of division 1 of the Criminal Code.

4. SAME—*description of locality of nuisance.* In an indictment for causing or suffering dead animals, etc., to be collected and remain near the dwellings of others, no other description of the locality of the place other than the venue laid in the proper county is necessary. If, however, the indictment is of a particular building or structure, which is sought to be removed or abated. its location must be set out with particularity; and so, also, where the locality becomes a part of the description of the offence.

5. SAME—*of the intent to create a nuisance—whether material.* Where a person causes or suffers the carcasses of dead animals to be collected, deposited or to remain in any place to the prejudice of others, he is guilty of an offence under the statute, whether he intended the prejudicial result to others or not. The prejudice to others intended by the statute, which renders the act an indictable nuisance, is that legal prejudice or injury which would render the defendant liable in a civil action or indictable at common law.

6. SAME—*improper mode of operating a lawful business.* If it be conceded that the business of operating tanks in rendering dead animals is not of itself a nuisance, or liable to become so, when managed with proper care, yet if the party conducting such business buys or collects more of such dead animals than he can dispose of, and suffers, for a number of days, large quantities of putrid and offensive carcasses to lie exposed at his establishment, to the prejudice and annoyance of those in the neighborhood, he may be convicted of a nuisance. In such case the business is not carried on with proper care.

7. SAME—*persons complaining, contributing to the support of business.* On indictment of one for carrying on an offensive business, which is a public nuisance, and prejudicial to persons in the neighborhood, the fact that some or all of the persons named in the indictment as being injured, may have voluntarily contributed to the increase or support of the business, will afford no excuse or justification of the defendant in so conducting the business as to make it a nuisance.

8. SAME—*as depending on place where business is carried on.* In respect of trades and business which generally produce ill effects upon the adjacent owners of property. such as tanneries, smelting works, rendering and soap factories, and the like, denominated *prima facie* nuisances, the weight of authority seems to be that no place can be held to be suitable and convenient for the exercise of a noxious trade, when injurious results therefrom ensue to others. But in respect of business or trades which produce merely annoyance, producing physical discomfort, which is not hurtful in character,— that is, injurious to health or life,—the rule is not of the same strictness.

9. SAME—*public benefit no justification.* In respect to nuisances, the law will not balance public conveniences with inconveniences, and it makes

no difference that the work is really in the interest of society or necessary for the preservation of the public health. The fact that the thing complained of furnishes, upon the whole, a greater convenience to the public than it takes away, is no answer to an indictment for nuisance.

10. SAME—*evidence to show offensive character of business.* On the trial of one indicted for a nuisance in the collection of dead hogs, etc., at the defendant's rendering tank, any evidence tending to establish that the carcasses or offal or filth collected and deposited at the tank were noisome and prejudicial to others, is proper. It is proper to allow witnesses to testify as to the condition of such carcasses while being hauled to the tank, and that such carcasses, and the wagons in which they were hauled, were offensive.

11. CRIMINAL LAW—*of the theory that many who are guilty should escape rather than one innocent man should suffer.* An instruction in a criminal case is properly refused which asserts that the policy of the law is, that it is better that ninety-and-nine, or any other number of guilty persons, should escape, than that one innocent man should be convicted, and that it is not sufficient to authorize a conviction that the greater weight or preponderance of the evidence supports the allegations of the indictment.

12. INSTRUCTION—*whether subject to objection of singling out facts.* On the trial of one for a public nuisance, the court instructed the jury, for the People, that it was no defence that the defendant's business was a benefit to persons having dead hogs, or that certain of the People's witnesses had sold dead animals to the defendant to be rendered, and the like: *Held,* that the instruction was not subject to the objection that it singled out and made prominent isolated facts.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Warren county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Plaintiff in error was, at the September term, 1885, of the Warren circuit court, indicted for nuisance. At the January term, 1886, a motion to quash the indictment was overruled, and a trial had, resulting in a verdict of guilty. Motions for new trial and in arrest were severally overruled, and sentence on the verdict entered, imposing a fine of $50, and judgment for the same, and costs. The judgment of the circuit court was affirmed by the Appellate Court for the Second District, and the defendant prosecutes this writ of error to that court.

40—121 ILL.

The rulings of the court were properly excepted to, and plaintiff in error assigned as grounds of reversal, in the Appellate Court, the overruling of the several motions to quash, for new trial and in arrest of judgment, and the giving of improper instructions for the People, refusal of instructions asked by the defendant, and error in the admission and exclusion of testimony. The errors here assigned question the judgment of affirmance by the Appellate Court.

The charging part of the indictment is as follows, omitting prefatory words: "That Wilkins Seacord, on * * * at * * * and continually from said day to the time of the finding of this indictment, unlawfully and willfully did cause and suffer the carcasses of divers dead animals, and large quantities of offal, filth and noisome substances, then and during all the time aforesaid, and there to be collected, deposited and remain near the dwelling houses of N. F. Conrad, Thomas Kernan, Peter Johnson, Charles Fauble and others, there situate and being, then and during all the time aforesaid, and there to the prejudice of the said N. F. Conrad, Thomas Kernan, Peter Johnson, Charles Fauble and others, and to the common nuisance of all the people there lawfully being and abiding, contrary to the form of the statute.

The facts are sufficiently discussed in the opinion to avoid necessity for further statement.

Mr. WILLIAM C. NORCROSS, Messrs. WILLIAMS, LAWRENCE & BANCROFT, and Mr. GEORGE W. THOMPSON, for the plaintiff in error:

The indictment does not charge the offence with sufficient certainty, either as to the character of the nuisance or its locality. The rule is, that in nuisances, except of barratry, common scold, and possibly one or two others, the acts constituting the nuisance must be set out with the detail and fullness required in other offences. The indictment must both identify the transaction and affirmatively show *prima facie*

guilt. When a thing is not *per se* a nuisance, but becomes so by special circumstances, these must be charged. 2 Bishop on Crim. Proc. sec. 865; *McNair* v. *People*, 89 Ill. 443.

In determining whether a thing is a public nuisance, when the public health is not concerned, the public good it does may, in some cases, be considered, to see if it outweighs the public annoyance. 1 Russell on Crimes, 297; Cooley on Torts, 596-598.

The second of the People's instructions is bad, in omitting to require the jury to find defendant guilty of the intent charged. *Slattery* v. *People*, 76 Ill. 220.

The sixth instruction on the part of appellee is bad, because it calls attention to isolated facts, thereby giving them undue prominence,—such as the expression, "that it is no defence that parties took dead hogs to tank, whether witnesses or not," and the expression as to the "business being of benefit to a certain class of community," etc. *Hewett* v. *Johnson*, 72 Ill. 513; *Emery* v. *Hoyt*, 46 id. 258.

Said instruction is further bad, because it ignores the doctrine of the necessity of the case, and the good derived by the public therefrom. 1 Broom's Legal Maxims, 1, 2, 3; Russell on Crimes, 297; Cooley on Torts, 596-598.

The second refused instruction on the part of appellant is the law. *Lyons* v. *People*, 68 Ill. 272.

The first and third refused instructions are based on the theory of the defence, and ought to have been given. *Lamb* v. *People*, 96 Ill. 73; *Waggeman* v. *Bracken*, 52 id. 468.

Mr. JOHN W. MATTHEWS, State's Attorney, and Mr. FREDERICK A. WILLOUGHBY, for the People:

The indictment charges the nuisance with all the certainty, viz., "the carcasses of divers dead animals, and large quantities of offal, filth and noisome substances to be collected, deposited and remain near," etc. The language is that of the statute. *Fuller* v. *People*, 92 Ill. 184; *McCutcheon* v. *People*,

69 id. 601; *Warriner* v. *People,* 74 id. 346; *Cole* v. *People,* 84 id. 216.

As to the sufficiency of the averment of locality in nuisance, see *State* v. *Lang,* 63 Me. 215; *State* v. *Sterdivant,* 21 id. 9; *Commonwealth* v. *Chemical Works,* 16 Gray, 231; *Commonwealth* v. *Kelly,* 10 id. 464.

A continuance for more than twenty years, before a highway or dwelling houses are erected, is no defence to an indictment for a nuisance. *Commonwealth* v. *Upton,* 6 Gray, 473.

An offensive trade carried on remote from others, is lawful. When adjacent territory is devoted to domestic or business uses, and the inhabitants are rendered uncomfortable, it becomes unlawful. *Taylor* v. *People,* 6 Parker, 347. See, also, Wood on Nuisances, sec. 505; *State* v. *Kaster,* 35 Iowa, 221.

Any business, however lawful in itself, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained. *Wahle* v. *Reinbach,* 76 Ill. 322.

On a trial for nuisance, the prosecution need not prove a criminal intent. *Taylor* v. *People,* 6 Parker, 347.

The strictures upon the sixth instruction seem trivial. The doctrine of necessity only applies to cases where the public health is not concerned. 1 Russell on Crimes, 297.

Offensive odors directly affect the public health, and are without the doctrine of necessity. Privies are absolute necessities, but are *prima facie* nuisances, and abatable. *Wahle* v. *Reinbach,* 76 Ill. 322.

The second refused instruction is not the law. Counsel have overlooked *Adams* v. *People,* 109 Ill. 451, where that favorite ninety-and-nine instruction is definitely laid to rest.

Mr. Justice Shope delivered the opinion of the Court:

This was an indictment for nuisance, under the first clause of section 221, paragraph 227, (Starr & Curtis,) page 815, of the Criminal Code, which reads: "It is a public nuisance:

Keeping offal.—1. To cause or suffer the carcass of any animal, or any offal, filth or noisome substance to be collected, deposited or to remain in any place, to the prejudice of others.'"

The first error assigned is the overruling of a motion to quash the indictment. It is first objected, that the indictment does not sufficiently describe the offence. To this a sufficient answer is, the indictment charges the offence in the language of the statute, changing the disjunctive to the conjunctive form, as it is proper to do. We have repeatedly held that it is sufficient if the offence is charged substantially in the language of the statute creating it. *McCutcheon* v. *People*, 69 Ill. 601; *Warriner* v. *People*, 74 id. 346; *Cole* v. *People*, 84 id. 216; *Fuller* v. *People*, 92 id. 184.

But the indictment is not obnoxious to this objection. It is sufficient if the acts constituting the nuisance be set out with the detail and fullness required in respect of other offences, —that is, that the facts set out "must identify the transaction and affirmatively show *prima facie* guilt." So when a thing is not a nuisance of itself, but becomes so by its special circumstances, this must be alleged. Thus, "if the nuisance is a public show, corrupting to the public morals, so much of the facts of its indecency, barbarity, or the like, must be stated as will enable the court to discern its indictable character." (2 Bishop on Crim. Proc. 861-865.) Here, the nuisance is made to consist in causing or suffering the carcasses of animals, etc., to be collected, deposited or to remain in any place to the prejudice of another; and the rule of pleading requires only the statement of such facts as constitute the offence.

The next objection urged is, that the locality of the nuisance is not sufficiently described. No description of the locality, other than that given in the statute, (*i. e.*, place,) is requisite, other than the venue laid in the proper county. (2 Bishop on Crim. Proc. 866.) If the indictment is of a particular building or structure which is to be removed or abated under the order of the court, its location must be set out with particularity.

So, also, if the locality becomes part of the description of the offence,—as, where the law designates a particular place, as on a bridge or within a city, or the like, where an act otherwise lawful shall be a nuisance,—the location must be aptly averred; but generally, and in cases of this sort, the venue, only, need be stated.

It appears that the plaintiff in error owned and was operating rendering tanks, at which dead hogs were collected, and there rendered in the manner usual at such establishments, and it was at and about such tanks that it was attempted to be shown the nuisance was committed. Dead hogs were collected from the surrounding country and railway station, and hauled to the tank in a wagon kept by plaintiff in error therefor. Witnesses were permitted to testify as to the condition of the carcasses while being hauled to the tank, and that such carcasses, and the wagon after they had been hauled in . it, were offensive and noisome. This is assigned for error. It was not sought to convict for hauling or having in his wagon the offensive carcasses of dead animals. But this evidence was admitted, and properly, to show the character of the material collected and deposited at the tanks. Any evidence tending to establish that the carcasses, or offal or filth collected and deposited at the tanks by defendant, was noisome, and prejudicial to others, was proper, and this evidence certainly tended to prove such facts.

It is contended that the court erred in giving the People's second and sixth instructions. The criticism of the second instruction is, that it excludes the duty of the People to prove the intent with which the act complained of was done. The criticism is unwarranted. The offence charged consists, as before said, in collecting, etc., carcasses of dead animals, etc., so that others will be or are prejudiced thereby,—not in collecting, etc., with the intent that others shall be injured or prejudiced. If it appear that the defendant actually caused or suffered the carcasses to be collected, deposited or to re-

main in any place, the offence would be complete if others were, in fact, prejudiced thereby. The prejudice to others, contemplated and intended by the statute, which renders the act an indictable nuisance, is that legal prejudice or injury which would render the defendant liable in a civil action, or indictable at common law. It is immaterial whether the defendant intended the prejudicial result to others or not, if such result flows from his unlawful act in collecting and depositing the prohibited noisome substances. It is presumed that every sane man intends the natural and probable consequences of his act.

The People's sixth instruction, it is said, is erroneous, in that it singles out and makes prominent isolated facts. It is true the jury were told that it was no defence that the business was a benefit to persons having dead hogs, or that certain of the People's witnesses had sold carcasses of dead animals to be rendered, and the like,—and this is the singling out of isolated facts complained of. The bare statement of the scope of the instruction demonstrates that it is not obnoxious to the criticism. See *Hewett* v. *Johnson*, 72 Ill. 513; *Emery* v. *Hoyt*, 46 id. 258.

The defendant's second refused instruction asserted that the policy of the law is, that it is better that ninety-and-nine, or any number of guilty persons, should escape, than that one innocent man should be convicted, and that it is not sufficient to authorize a conviction that the greater weight or preponderance of the evidence supports the allegations of the indictment. This instruction, in the precise form here presented, was before us in *Adams* v. *People*, 109 Ill. 444, and was condemned, and we see no reason for departing from that holding.

The defendant's first and third refused instructions were properly refused. Improper elements were introduced in each of them. The first instruction is based upon the theory that defendant having located his rendering tanks remote from thickly settled communities as far as they reasonably could

be, and that they were managed with the most approved appliances, and he had made reasonable provision for rendering what might be brought to the tanks, or such provision as, in the judgment of a reasonably prudent man, would be sufficient therefor, he would not be liable if he should cause more to be brought to the tanks than could be rendered, however offensive to the neighborhood such carcasses might become, if the jury believed that the business was not a nuisance when the carcasses were rendered as fast as they were collected.

In determining whether establishments of this kind, which belong to the class denominated *prima facie* nuisances, are nuisances in fact, the location, whether convenient or otherwise, as well as the management, and the effect produced on the neighborhood, must be considered. If it be conceded, as contended, that the tanks were not, of themselves, or the business of operating them was not, a nuisance, or liable to become so when operated with proper care, yet the fallacy of the instruction is apparent, in that it assumes that the defendant was justified in collecting more carcasses than could be rendered before they became offensive to the neighborhood. It may have been convenient for farmers to sell their dead hogs, and defendant may have been bound to care for or of the dead animals on the trains of the railroad, but he was not bound to buy or collect more than he could dispose of. What excuse can it be to him for permitting, for a number of days, large quantities of putrid carcasses to lie exposed at his establishment,—that more hogs died than his tanks had capacity to render? It is true the defendant says he did not think it would be treating his neighbors right not to take their dead cholera hogs, but when he took them in quantities larger than he had the ability to care for and prevent becoming a nuisance to the neighborhood, he was not in the exercise of ordinary or reasonable care. The evidence abundantly shows that the effluvia emanating from the carcasses of dead animals, and filth there accumulated, was so offensive as to render uncom-

fortable, physically, every one of the persons named in the indictment, and others within the range of its effects. The jury were amply justified in finding that the degree of discomfort produced by the noisome odors therefrom would make it an indictable nuisance.

The evidence of the defendant shows he was yard-master of the Chicago, Burlington and Quincy railroad, at Galesburg, and entered into a contract with that company to take care of the dead animals arriving on trains or in the yards of the company. With this view he erected the tanks in question, in Warren county, and had the dead hogs taken there to be rendered; that he also purchased cholera hogs from farmers, as they were offered, which were also taken to the tank. The tanks were large enough, he says, to dispose of all hogs taken from the trains and yards, and generally all others, but at times, in hot weather, and when the cholera was bad, and an unusual number of hogs died in shipment, they accumulated at the tanks. He says: "I have not felt, myself, as though I was doing, or permitting anything to be done, of which a reasonable man would be likely to complain, except for a short time in July, and a short time in August, for a day or two. In July, from the 13th to the 17th, 1885, that tank was not in a condition that was at all satisfactory to me. It was extremely hot weather. There are western packing houses all up and down the Missouri river, and in Iowa, that consume a great many hogs; but in the summer season, in hot weather, they quit, as they have not the appliances, outside of Kansas. City, that they have in Chicago,—cooling rooms, etc. In consequence of that, we had a larger number of hogs coming over the line of road at that time than we have ever had before or since, and the weather being extremely hot, many of them were dead, and cholera was bad, so that the dead hogs from the trains, and from the farmers near the tank, made a larger supply than I was able to take care of at the tank as they came in. I don't think the time has ever been when I couldn't,

take care quickly of *all* the hogs that I got from the trains.
But a great many hogs were hauled in from the country.
During the year there has been paid for dead animals ren-
dered there, about $12,000. About $6700 of that was paid to
the farmers who delivered hogs to the tank. I did the best I
could to get the hogs out of the way that time,—everything
in my power. I ran the tanking business day and night, in-
cessantly. I did not wish to annoy any one." It also appears
that the refuse, after extracting the grease, by steam, was
dumped into pits at most three feet deep, and being liquid,
would ferment, creating gas, which would force pipes or vent
holes through the earth covering, and escape into the air. It
is not shown that there was any reason for the accumulation,
save that he collected more hogs at the tank than could be
immediately rendered.

The third instruction is faulty, in that it would, if given,
authorize the jury to consider other distinct nuisances not
connected with the one in question, and also, if they found,
from the evidence, that the persons named in the indictment
as having been prejudiced by the nuisance, or some of them,
have, from time to time, voluntarily contributed to the sup-
port and increase of the business, etc., of the tanks, such facts
might be considered in determining the question of nuisance.
If it was shown that there were other nuisances at the same
time, which is not here established, their presence would be no
justification to the defendant. The question was, is the business
of defendant productive of odors which are offensive to those
within their range, so as that it produces physical discomfort.
(*Rex* v. *Neil*, 2 C. & P. 485; Russell on Crimes, 437.) It can
not be said, either, that because one of the persons named in
the indictment, or all of them, may have voluntarily contrib-
uted to the increase or support of the "business," it would jus-
tify or excuse the defendant in so conducting his business that
it would become a nuisance. (Wood on Nuisance, 553; *Smith*
v. *Phillips*, 8 Phila. 10; *Tipping* v. *St. Helen Smelting Co.*

1 L. R. 66; Roscoe on Crim. Ev. 795.) It is not shown or contended that any of such persons did more than to sell the defendant the carcasses of dead animals, or that they had any control over or management of the business, or of the quantity of material collected.

But each of these instructions assumes that the public necessity and convenience required the disposition of the animals taken to the tank, and to this branch of the case the major portion of the argument of counsel is directed. It is said the proof shows the existence of three things: First, necessity for the business; second, suitableness of location of defendant's tank; and third, proper care and management,—and these concurring, it is said, establish the non-liability of the defendant. It is also insisted, with great apparent earnestness, that the acts of defendant are justified by the immediate urgency for the disposition of the dead animals, out of regard for the public health and convenience. In respect to the suitableness of location it may be said, that in respect of trades and business which generally produce ill-effects upon the adjacent owners of property, such as tanneries, smelting works, rendering and soap factories, and the like, and denominated, therefore, *prima facie* nuisances, the weight of authority in this country and Great Britain probably is, that no place can be held to be convenient for the exercise of a noxious trade where injurious results therefrom ensue to others. In respect, however, of business or trades which produce merely annoyance, thereby producing physical discomfort, but which is not hurtful in character,—that is, injurious to health or life,—the rule is not of the same strictness. (See *Tipping* v. *St. Helen Smelting Co. supra; Rex* v. *Dixon*, 10 Mod. 339; Hawkin's Pleas of the Crown, b. 1, chap. 75, sec. 10; Opinion by Blackburn, J., in *Fletcher* v. *Ryland*, 1 L. R. Exch. 289; *McKeon* v. *See*, 51 N. Y. 511; *Fletcher* v. *Ryland*, 3 L. R. (H. L. Cas.) 330; Opinion of Gibbs, J., in *Freeman* v. *Cohoes Co.* 32 N. Y. 159; *Peck* v. *Elder*, 3 Sandf. 126; *Catlin* v. *Valentine*, 9 Paige Ch. 575;

*Stockport Water Works Co.* v. *Potter,* 7 H. & W. 167; *Pinkney* v. *Ewans,* 3 L. T. (N. S.) 741; *Attorney General* v. *Leeds,* 39 L. J. 354; *Cahill* v. *Eastman,* 18 Minn. 324; *Beardmore* v. *Treadwell,* 3 Giff. 683; *Bamford* v. *Turnelly,* 31 L. J. 286, cited in full, p. 690, *et seq.* 3 Giff.) However, it will not be necessary to determine this question here, for it clearly appears that the defendant was guilty of collecting the carcasses of dead animals at his tanks, and depositing and permitting to remain, noisome substances, contrary to the provision of the statute, independently of the business of carrying on his rendering establishment.

In respect of the third proposition,—that is, proper care and management, by the defendant, of his business,—it has already been shown that whatever the care exercised to prevent the mere rendering of the carcasses in defendant's tanks from being prejudicial to others, he permitted to be collected and deposited there, dead animals, offal and filth, in direct violation of the statute, unless the public necessity or convenience will justify his acts. The law does not, however, balance conveniences, and it makes no difference if the work is really in the interest of society or necessary for the preservation of the public health. It is now well settled "that, the circumstance that the thing complained of furnishes, upon the whole, a greater convenience to the public than it takes away, is no answer to an indictment for nuisance." (Roscoe on Crim. Ev. pp. 794-598, m. 1.) In *Attorney General* v. *Leeds,* 39 L. J. 354, the town of Leeds was indicted for a public nuisance created by the discharge of sewerage of the town into a river, and thereby polluting the stream. The defence was, that there was no other practicable way to drain the town, and the health of the inhabitants thereof depended upon maintaining this outlet for its sewerage. It was held to be no defence, the court holding that in prosecutions or actions for nuisance the court would not balance conveniences, but when the violation of the public or private right was clear, there could be no excuse heard

of public convenience that would protect the person or corporation committing the nuisance, from civil or criminal prosecution. In *Rex* v. *Russell*, 6 B. & Cress. 566, it was held, at *nisi prius*, that where a great public benefit accrues, arising from the abridgment of the right of passage, such abridgment is not a nuisance; but in *Rex* v. *Ward*, 4 Adolph. & Ellis, 384, *Russell's case* was expressly overruled, and it was there held that there can be no balancing of benefits, and a defendant will not be permitted to show that the public benefit resulting from the alleged nuisance was equal to the public inconvenience occasioned thereby. In *State* v. *Kaster*, 35 Iowa, 221, on indictment for nuisance in maintaining shipping yards, it was held to be no defence that the shipping yards were a great and essential accommodation to the public; that owing to their locality, character of surface, etc., they were less offensive than any other answering the same public demand, and were reasonably well kept. See, also, *Hart* v. *Mayor of Albany*, 9 Wend. 517; 3 Greenleaf on Evidence, sec. 187; *Attorney General* v. *Colney Hatch Lunatic Asylum*, 4 L. R. 146; *Holsman* v. *Boiling Springs Co.* 14 N. J. 335; *Chute* v. *State*, 19 Minn. 271.

This position is not only abundantly sustained by authority, but is sound in principle. To hold otherwise would be to compel the citizen to abandon his property at the demand of the public convenience, without the forms of law and without compensation. To live in the comfortable and free enjoyment of the air, free from unnecessary pollution, is the right of all, and any act which takes this away from an individual, is actionable as a private injury; that which deprives the community of the right, is indictable as a public wrong. If it was necessary for the public health or convenience that dead animals should be summarily disposed of, means could be readily found, without accumulating them from the adjacent towns and cities and stations of a great railway, and from the surrounding country, in one locality. This particular neighborhood, comprising only perhaps a score of families, owed no

servitude to these towns and cities, or to the railway or surrounding country. Its right to the enjoyment of pure air, and of its homes in physical comfort, was as valuable to its inhabitants, and as certainly assured to them by the law, as to citizens of any other locality, however opulent. It can not be said, nor is there reason or authority for the position, that for the public convenience of the city of Galesburg, or other towns or stations, or of the railroad or of adjacent farmers, or because it may be profitable to shippers or others that the business be carried on, those persons named in the indictment, or this neighborhood, shall be compelled to submit to having their lives made physically uncomfortable, and their homes made unenjoyable, by noisome or noxious odors and gases. Private property can not be taken for public use without just compensation, and it can make little difference whether it is taken, or is destroyed for the uses of civilized life. It can make no difference that the convenience, or even the preservation of the health, of a large population required the speedy disposition of the dead animals, or that the number actually injured by the nuisance is comparatively small.

There is no error in this record for which the judgment should be reversed, and it will be affirmed accordingly.

*Judgment affirmed.*